## MOSES LOWENBERG, plaintiff in error, *v.* THE PEOPLE, defendants in error.

On a trial for murder, a juror was challenged for principal cause, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, and it was shown that he had formed an opinion that the person charged to have been murdered, was killed by the prisoner. *Held,* that the challenge was not sustained.

Where, on a trial for murder, a juror was challenged for favor, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, the court refused to charge the triers, on the request of the prisoner's counsel, that they should find the challenge true, if, from the evidence, they should find that the juror believed that the person charged to have been murdered, was killed by some one.

On a challenge for favor, the juror testified, before the triers, that he had conscientious scruples in reference to serving as a juror, in a case where the punishment, on conviction, would be death; that he would, if he took an oath to serve as a juror render a verdict in accordance with the evidence, but that it would violate his conscience to do so, and that he could not, where the punishment was death, conscientiously render a verdict which would take a man's life, even if the evidence clearly showed that the prisoner was guilty. The court refused to charge the triers, that assuming what the juror had sworn to to be true, no cause was shown which would justify the triers in finding the challenge true.

The prosecution challenged a juror for favor, on the ground that he was not indifferent between the People and the prisoner. The prisoner's counsel demurred to the challenge and assigned for cause that the challenge did not specify any sufficient ground in law, and the district attorney joined in demurrer. *Held,* that the demurrer was not sustainable, and it was overruled.

On such a challenge the juror, when examined as a witness before the triers, was asked, "have you any conscientious scruples against rendering a verdict of guilty, in a case where the punishment, upon conviction, is death?" On objection, held that the question was competent.

Charge of the recorder of the city of New York, in a case of murder committed after the passing of the act of 1860, stating the rules by which the jurors were to discriminate between murder in the first and second degrees, and manslaughter in the third and fourth degrees, and explaining the law of excusable and justifiable homicide.

Where statements, made by the prisoner, have been proved and put in evidence on the part of the prosecution, they are only evidence to be considered in connection with all the other evidence in the case. The prosecution is not bound or concluded by them.

Lowenberg *v.* The People.

The good character of a prisoner is always a proper subject for the consideration of a jury; it may be taken into consideration not only in a case where doubt of guilt exists, but it may sometimes, of itself, generate a doubt in the mind of the jury. But where a clear case of guilt is made out on the proof, evidence of good character is of comparatively little importance.

To convict of murder in the first degree, under the act of 1860, it is sufficient if premeditation and deliberation came into existence, with the intent to kill, on the instant of striking the blow by which the death was caused.

Where the term of the Court of General Sessions of the city and county of New York, is continued, under the provisions of the act of 1846 (*Sess. Laws of 1846, p.* 4), beyond the time prescribed by 2 *R. S.*, 217, § 31, by reason of the unfinished trial of a case commenced during the regular term, the court being legally in session, may proceed to pass judgment upon prisoners previously convicted.

The prisoner was convicted and tried before the Court of General Sessions of New York, in December, 1861, for having murdered Samuel Hoffman in November, 1861, and was found guilty of murder in the first degree, and, on the fourth of January, 1862, was sentenced to suffer the punishment of death on Friday, the twentieth day of February, 1863, and to be confined at hard labor in the State prison until such punishment of death should be inflicted. On error to this court, the judgment was affirmed,[1] Justice INGRAHAM dissenting.

Form of a return to a writ of error by the Court of General Sessions of New York, containing writ of error, allowance of writ with stay of proceedings, indictment in a case of murder, necessary entries on the record, statement from minutes of the court, &c., &c.

THIS case comes before the court on writ of error, in the following form : '

The People of the State of New York, to the Court of General Sessions of the peace, in and for the city and county of New York, greeting :

Because, in the record and proceedings, and also in the giving judgment upon a certain indictment which [L. S.] was in our said court, before you, against Moses Lowenberg, for murder, as is said, manifest error has intervened to the great damage of the said Moses Lowenberg, as he complains, and we being willing that the error, if any, should be corrected, and full and speedy justice done to the party aforesaid, in this behalf, do command you, that if judgment be thereupon given, then without delay, you distinctly

---

[1] NOTE.—See note at the end of this case.

and openly send, under your seal, the record and proceedings aforesaid, with all things touching or in anywise concerning the same, to our justices of our Supreme Court, at the city hall, in the city of New York, on the first Monday of February, 1862, together with this writ, to the office of the clerk of the city and county of New York, that the record and proceedings aforesaid, being inspected, we may cause to be done thereupon, for correcting that error, what of right ought to be done. And we do further direct, that this writ is to operate as a stay of proceedings on the judgment upon which such writ is brought.

*Witness*— Hon. GEORGE G. BARNARD, one of the justices of our Supreme Court, this 6th day of January, 1862.

By the Court.

H. W. GENET, *Clerk.*

HENRY L. CLINTON, *Attorney.*

[INDORSED.]

SUPREME COURT.

| | |
|---|---|
| Moses Lowenberg, plaintiff in error, *v.* The People, defendants in error. | Writ of error. |

Returnable 1st Monday of February, 1862.

HENRY L. CLINTON, *Attorney.*

I allow the within writ, and I do direct that the same is to operate as a stay of proceedings on the judgment upon which such writ is brought.

WM. H. LEONARD, *Justice.*

Dated New York, January 6th, 1862.

The return to the writ of error was as follows:

The answer of the judges of the Court of General Sessions of the Peace, in and for the city and county of New York, within named, a transcript of the record, whereof mention is within made, with all things touching, or in anywise concerning the same, we certify under the seal of our said court, to the justices of the Supreme Court, within mentioned in a certain schedule to this writ annexed, as within it is commanded.

By the Court,

[L. S.]                  HENRY VANDERVOORT, *Clerk.*

Lowenberg *v.* The People.

*State of New York, city and county of New York, ss:*

BE IT REMEMBERED, that at a Court of General Sessions of the Peace, holden at the city hall, of the city of New York, in and for the city and county of New York, on the first Monday of November, in the year of our Lord one thousand eight hundred and sixty-one, before JOHN H. McCUNN, Esq., city judge of the said city of New York, justice of the said court, assigned to keep the peace of the said city and county of New York, and to inquire by the oaths of good and lawful men of the said county, of all crimes and misdemeanors committed or triable in said county, and to hear, determine and punish according to law, all crimes and misdemeanors in the said city and county, done and committed.

By the oath of, &c.

(Here were inserted the names of the grand jurors.)

It was then and there presented as follows, that is to say :

*City and county of New York, ss:*

The jurors of the People of the State of New York in and for the body of the city and county of New York, upon their oath present:

That Moses Lowenberg, late of the first ward of the city of New York in the county of New York, aforesaid, on the fourteenth day of November, in the year of our Lord, one thousand eight hundred and sixty-one, at the ward, city and county aforesaid, with force and arms, in and upon one Samuel Hoffman, in the peace of the People of the State, then and there being willfully and feloniously, deliberately and premeditatedly, and of his malice aforethought, did make an assault; and, that the said Moses Lowenberg, with a certain knife, which he, the said Moses Lowenberg, in his right hand then and there had, and held him, the said Samuel Hoffman, in and upon the chest of him, the said Samuel Hoffman, then and there willfully, deliberately, premeditatedly, feloniously and of his malice aforethought, did beat, strike, stab, cut and wound, giving unto the said Samuel Hoffman, then and there, with the knife aforesaid, in and upon the chest of him, the said Samuel Hoffman, one mortal wound of the breadth of two

inches, and of the depth of six inches, of which said mortal wound he, the said Samuel Hoffman, on the day and year aforesaid, at the ward, city and county aforesaid, did die.

And so the jurors aforesaid, upon their oath aforesaid, do say that he, the said Moses Lowenberg, him the said Samuel Hoffman, in the manner and form, and by the means aforesaid, at the ward, city and county aforesaid, on the day and the year aforesaid, willfully, deliberately, premeditatedly, feloniously, and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

The jurors aforesaid, upon their oath aforesaid, do further present, that the said Moses Lowenberg, late of the first ward of the city of New York, in the county of New York, aforesaid, on the fourteenth day of November, in the year of our Lord, one thousand eight hundred and sixty-one, at the ward, city and county aforesaid, with force and arms, in and upon one Samuel Hoffman, in the peace of the People of the State, then and there being, willfully and feloniously, deliberately, premeditatedly and of his malice aforethought, did make an assault; and that the said Moses Lowenberg, with a certain sword, which he, the said Moses Lowenberg, in his right hand then and there had and held, him, the said Samuel Hoffman, in and upon the chest, then and there willfully, deliberately, premeditatedly, feloniously and of his malice aforethought, did strike, beat, stab, cut and wound, giving unto the said Samuel Hoffman then and there, with the sword aforesaid, in and upon the chest of him, the said Samuel Hoffman, one mortal wound, of the breadth of two inches, and of the depth of six inches, of which said mortal wound, he, the said Samuel Hoffman, on the day and in the year aforesaid, at the ward, city and county aforesaid, did die.

And so the jurors aforesaid, upon their oath aforesaid, do say, that he, the said Moses Lowenberg, him, the said Samuel Hoffman, in the manner and form, and by the means aforesaid, at the ward, city and county aforesaid, on the day and the

Lowenberg *v.* The People.

year aforesaid, willfully, deliberately, premeditatedly, feloniously and of his malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity.

And the said Moses Lowenberg, afterwards, to wit, on the thirtieth day of November, in the year of our Lord one thousand eight hundred and sixty-one, at the place last mentioned, before the said justice above named, came in his own proper person, and being brought to the bar here in his own proper person, and arraigned upon the said indictment, and having heard the said indictment read, and being asked whether he demanded a trial upon the said indictment, answers that he does require a trial thereon, and says that he is not guilty thereof; and thereupon for good and ill is put upon the country.

And Nelson J. Waterbury, Esq., district attorney for the city and county of New York, who prosecutes for the People of the said State of New York, in their behalf, doth the like.

And afterwards, to wit, at a Court of General Sessions of the peace, held in and for the said city and county of New York, at the city hall of the said city, on the twelfth day of December, in the year of our Lord one thousand eight hundred and sixty-one, before JOHN T. HOFFMAN, recorder of the city of New York, and justice of the said court, comes the said Moses Lowenberg, and the said Nelson J. Waterbury, Esq., district attorney, likewise comes. Therefore, let a jury thereupon immediately come before the justice last above mentioned, of free and lawful men of the said city and county, each of whom hath, &c., by whom the truth of the matter may be better known, and who are not of kin to the said Moses Lowenberg, to recognize upon their oath whether the said Moses Lowenberg be guilty of the murder and felony, in the indictment aforesaid above specified, or not guilty.

And the jurors of the said jury, by John Kelly, Esq., sheriff of the city and county of New York, for this purpose empanneled, and returned, to wit:

Charles D. Horter, Otto H. Kopp, Solomon J. Gowey, Wil-

liam S. Tarbell, William C. Tallmage, Benjamin R. Conklin, Richard W. Hendrickson, John C. Graham, John Beam, Edward W. Ketcham, James C. Durant, Josiah S. Breese.

Who being called, come; and who being then and there elected, tried and sworn well and truly to try and true deliverance make between the People of the State of New York and the said Moses Lowenberg, then at the bar, whom they should have in charge upon the said indictment, and a true verdict give according to evidence, who, upon their oath aforesaid, say that the said Moses Lowenberg is guilty of the murder in the first degree and felony above charged in the form aforesaid, as by the indictment aforesaid is above alleged against him.

And upon this it is demanded of the said Moses Lowenberg whether he hath or knoweth anything to say wherefore the said justice here ought not, upon the premises and verdict aforesaid, to proceed to judgment against him, who nothing further saith, unless as before he has said. Whereupon all and singular the premises, being seen and by the same justice here fully understood, it is considered by the said justice that the said Moses Lowenberg, for the murder in the first degree and felony aforesaid, whereof he is convicted, do suffer the punishment of death for said murder and felony, on Friday, the twentieth day of February, in the year one thousand eight hundred and sixty-three, and that the said Moses Lowenberg be confined at hard labor in the State prison until such punishment of death shall be inflicted.

Judgment signed this 27th day of January, 1862.

JOHN T. HOFFMAN, *Recorder.*

A. OAKEY HALL, *District Attorney.*

COURT OF·GENERAL SESSIONS OF THE PEACE IN AND FOR THE CITY AND COUNTY OF NEW YORK.

| The People of the State of New York v. Moses Lowenberg. | Statement from the minutes of the Court. |
| --- | --- |

The December term of the court, in the year 1861, was commenced on Monday, the second day of the month, and was continued by adjournment from day to day, for the trans-

action of business up to and including Saturday, the fourth day of January, 1862, when the court was adjourned for the term. The trial of the above named defendant, Moses Lowenberg, commenced on the eleventh day of said month of December, 1861, and terminated late in the evening on that day, by the rendition of a verdict of guilty of murder in the first degree.

The trial of Charles M. Jeffards was commenced on the eighteenth day of the same month of December, and was continued from day to day until the twenty-fourth day of the same month, when it was concluded at three-quarters of an hour past ten o'clock in the evening, by a verdict of guilty of murder in the first degree. On the twenty-eighth day of the same month of December, the district attorney moved that judgment be pronounced upon the said Moses Lowenberg, and also upon the said Charles M. Jeffards, and upon the motion of the counsel for the prisoner in each case, the hearing of the said motions was postponed until the thirtieth of the same month. On the thirtieth day of the same month of December, the further hearing of the motions, that judgment be pronounced upon the said Charles M. Jeffards, and also upon the said Moses Lowenberg, was, upon the motion of the counsel for the prisoner in each case, postponed until the fourth day of January, then next ensuing. On the said fourth day of January, in the year 1862, at a Court of General Sessions of the Peace, holden in and for the city and county of New York, before the Hon. JOHN T. HOFFMAN, recorder of the city of New York, justice of the Sessions, on motion of the district attorney, A. O. Hall, Esq., it was ordered that Nelson J. Waterbury, Esq., be substituted as district attorney " Ad hoc," during the proceedings upon this indictment against Moses Lowenberg. Nelson J. Waterbury, Esq., late district attorney, moves for judgment upon the prisoner, according to law. H. L. Clinton and J. T. Brady move in arrest of judment. Counsel are heard in support of and in opposition thereto. The court overruled the same. The said Moses Lowenberg was then, to wit, on said fourth day of

January, A. D. 1862, asked what he had to say why judgment
of death should not be pronounced against him, according to
law, and he having nothing to say further than what he before
hath said, the said court thereupon, on said last mentioned day,
pronounced sentence as follows, to wit: Whereupon it is
ordered and adjudged by the court that the said Moses Low-
enberg, for the murder in the first degree and felony aforesaid,
whereof he stands convicted (being a crime punishable with
death), do suffer the punishment of death for said murder and
felony, on Friday, the twentieth day of February, in the year
of our Lord one thousand eight hundred and sixty-three, be-
tween the hours of ten in the forenoon and two in the after-
noon of that day, and it is further ordered and adjudged by
the court that the said Moses Lowenberg be confined at hard
labor in the State prison until such punishment of death shall
be inflicted.

Like proceedings were also had in the case of Charles M.
Jeffards.

HENRY VANDERVOORT, Clerk.

The defendant was indicted at a Court of General Sessions
of the peace, in and for the city and county of New York, on
the thirtieth day of November, 1861, for the murder of one
Samuel Hoffman, on the fourteenth day of November, 1861.
Upon his arraignment on said indictment he pleaded not
guilty, and put himself upon the country for trial. The issue
joined upon said indictment came on to be tried at said court,
on the eleventh day of December, 1861, before Hon. JOHN T.
HOFFMAN, recorder of the city and county of New York.
After several jurors had been called and challenged for prin-
cipal cause and to the favor, on the part of the prisoner and
set aside, one William E. Devries was called as a juror
and appeared, and was challenged for principal cause on the
part of the prisoner, on the ground that he had formed or
expressed an opinion as to the guilt or innocence of the pris-
oner, and the challenge denied by the counsel for the People,
the said William E. Devries having been sworn to testify the

Lowenberg *v.* The People.

truth as to his competency to serve as a juror, testified as follows :

I read of the affair; have no opinion about it; only saw in the paper that Hoffman, the person for the murder of whom the defendant was indicted, had been killed.

*Q.* Did you believe that to be true?

*A.* The papers said so; I did believe it to be true that Hoffman had been killed, as far as the paper stated.

*Q.* Has your opinion undergone any change since you read that statement?

*A.* My belief has not been changed that Hoffman was killed; I read he had been killed by Doctor Lowenberg, the prisoner; as far as the paper stated, I believed that to be true; my belief has not undergone any change since.

The court thereupon found the challenge not true, to which counsel for defendant then and there duly excepted. The said William E. Devries was then challenged by the defense for favor, which challenge was found to be not true, and he was then by the defense challenged peremptorily.

*Solomon J. Goeway* was called as a juror and appeared, and was challenged for principal cause, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, in reference to the charge on which he was then to be tried, and the challenge was denied by the counsel for the People. The said Solomon J. Goeway having been sworn to testify the truth as to his competency to serve as a juror, testified :

I think I read about the case some time ago; I have forgotten all about it; I read that Hoffman had been killed; I believed it to be true; I believed it to be true as much as anything I read in the papers; I think I believed that Hoffman was killed by a man named Lowenberg; I believed that to be true; the challenge was then withdrawn by the defense, and the said Goeway was thereupon challenged for favor by the counsel for the prisoner, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner. The said challenge was denied by the coun-

sel for the People, and tried by triers duly appointed and sworn, the said Goeway thereupon testified as follows:

I suppose that Hoffman is dead; I do not doubt that he was killed by somebody; I have no opinion as to whether or not he was killed by the prisoner. Counsel for defendant asked the court to charge the triers that they should find the challenge true, if they should find from the evidence of the juror Goeway, that he, the said juror, believed that Hoffman, the deceased, was killed by some one. The court refused so to charge, to which counsel for defendant excepted. The triers found the challenge not true, and the said Solomon J. Goeway was sworn as a juror to try the cause.

*Richard Hendrickson* was called as a juror, and appeared and was challenged for principal cause on the part of the prisoner, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, and the challenge was denied by the counsel for the People. The said Richard Hendrickson, having been sworn to testify the truth as to his competency to serve as a juror, testified as follows:

I have heard of the killing of Hoffman; I had no reason to doubt that he was killed by some one; I believed so then and believe so now. The court overruled the challenge for principal cause, to which counsel for the defendant excepted. The said Richard Hendrickson was thereupon sworn as a juror to try said cause.

*Thomas A. Gill* was called as a juror and appeared, and was challenged for principal cause on the part of the prisoner, and the challenge denied by the counsel for the People. The said Thomas A. Gill having been sworn to testify the truth as to his competency to serve as a juror, testified that he had not formed or expressed any opinion as to the guilt or innocence of the accused, whereupon the challenge was overruled, and the district attorney thereupon challenged the said Thomas A. Gill for favor. The said Gill thereupon testified as follows:

I have conscientious scruples in reference to serving as a juror in a case where the punishment, upon conviction, would

be death. On his cross-examination by the prisoner's counsel, the said Gill testified as follows:

I would, if I took an oath to serve as a juror, render a verdict in accordance with the evidence. Being examined by the district attorney, the said Gill further testified as follows:

It would violate my conscience to do so; I could not conscientiously render a verdict that would take a man's life, under any circumstances; I could not, where the punishment was death, even if the evidence clearly showed that the prisoner was guilty. Counsel for the prisoner requested the court to charge the triers, that assuming the said testimony of the said Gill to be in every respect true, no cause was shown which would justify the triers in finding the challenge true. The court refused so to charge, to which counsel for the defendant excepted.

*James C. Durant* was called as a juror and appeared, and was challenged for principal cause on the part of the prisoner, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, and the challenge was denied by the counsel for the People. The said James C. Durant having been sworn to testify to the truth as to his competency to serve as a juror, testified as follows:

I saw the case in the papers; I read that Hoffman had been killed by, I believe, Dr. Lowenberg; I had no reason to doubt the truth of the account; I believed it as far as the papers go, and I believe it now.

*Cross-examined by the district attorney:* I have no opinion as to whether Dr. Lowenberg killed deceased or not; I never expressed any opinion on the subject, to my knowledge, in my life.

*Re-examined by counsel for defendant:* I do not know that I intend to modify or change the evidence given by me on my direct examination; I think there is a distinction between an opinion and my belief; but I do not know that I can state it; I believed it because I read it, and formed an opinion that it was so because I never saw it contradicted.

*Recross-examination by district attorney :*

I never expressed to any one, any opinion or belief as to the guilt or innocence of the defendant. The court overruled the said challenge for principal cause, to which counsel for defendant excepted. The said James C. Durant was then sworn as a juror to try the cause.

*Otto H. Kopp* was then called as a juror and appeared, and was challenged for principal cause by the counsel for the defendant, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, and the challenge was denied by the counsel for the People. The said Otto H. Kopp having been sworn to testify the truth as to his competency to serve as a juror, testified that he had not formed or expressed any opinion as to the guilt or innocence of the prisoner. Whereupon, the challenge for principal cause was withdrawn, and the district attorney, thereupon, challenged the said Otto H. Kopp for favor, on the ground that the said Kopp was not indifferent between the People and the prisoner. Counsel for defendant demurred to said challenge, and assigned for cause, that the said challenge did not specify any sufficient ground in law. The district attorney joined in demurrer; whereupon the court overruled said demurrer, to which decision counsel for defendant excepted. The district attorney thereupon asked the said Otto H. Kopp the following question: Have you any conscientious scruples against rendering a verdict of guilty, in a case where the punishment, upon conviction, is death? Counsel for defendant objected to this question. The court overruled the objection, and allowed the question to be answered; to which decision counsel for defendant excepted. The said Kopp thereupon answered that he had not. The district attorney thereupon withdrew said challenge, and the said Kopp was sworn as juror to try the cause.

*William S. Tarbell* was called as a juror and appeared, and was challenged for principal cause on the part of the defendant, on the ground that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, and the challenge

was denied by the counsel for the People. The said William S. Tarbell having been sworn to testify the truth as to his competency to serve as a juror, testified that he had not formed or expressed an opinion as to the guilt or innocence of the accused, whereupon the challenge was withdrawn, and he was challenged by the defense for favor, and testified that he had no prejudice against a Jew or an Israelite, whereupon the latter challenge was also withdrawn. The district attorney thereupon challenged the said Tarbell for favor, on the ground that he was not indifferent between the People and the prisoner. Counsel for defendant demurred to said challenge for favor. The district attorney joined in demurrer. The court overruled the demurrer; to which counsel for defendant excepted. The witness thereupon testified that he had no conscientious scruples where the punishment was death. The district attorney thereupon withdrew the challenge, and the said William S. Tarbell was sworn as a juror to try the cause.

*Silas A. Allen* was called as a juror, and was challenged by the defense, for principal cause, and after he had been sworn and examined, the said challenge was withdrawn. The said Allen was then challenged for favor, on the part of the district attorney, on the ground that he was not indifferent between the People and the prisoner. The counsel for the prisoner demurred thereto, and the court overruled the demurrer, to which counsel for defendant excepted. Said Allen thereupon testified that he had no conscientious scruples against rendering a verdict of guilty, in a case where, upon conviction, the punishment was death, and the challenge was then withdrawn. The said Allen was thereupon peremptorily challenged by the counsel for defendant.

*M. P. Douton* was called as a juror, and appeared, and was challenged by the defense for principal cause, which challenge, after he had been sworn and examined, was withdrawn, and he was also challenged by defense for favor, which challenge was also withdrawn. The district attorney thereupon interposed a challenge to the said juror (Douton), for favor, on the ground that he was not indifferent between the prisoner and

the People. The counsel for the prisoner demurred thereto, because there was no further specification of the grounds of challenge, and the court overruled the demurrer, to which counsel for defendant excepted. The witness thereupon, upon the examination of the district attorney on said challenge, gave testimony, and the challenge was withdrawn, whereupon counsel for prisoner challenged the juror peremptorily.

After the jury had been empanneled, and the cause opened to the jury by the district attorney, *Mrs. Elizabeth Hoffman* was called as a witness on behalf of the prosecution, and being duly sworn, testified as follows:

I live at 141 First avenue; my husband died Thursday, November 14th, last, in my room, on a bed, at 141 First avenue; I know the defendant personally since May, this year; he lived at 141 First avenue; defendant occupied the front basement, and we lived in the rear basement; as far as I know, the defendant lived there; he had only the one room; I occupied the rear room and a room for residence in the rear house; we slept in the rear house; we had a little bed in the basement where my brother slept; I did not see defendant the evening before my husband died; night before deceased died I did not see defendant come in; I heard him come into his room; after that I saw the defendant when he did the deed; I was out; I saw him when I came in; I shut the door when I came in; he came out of his door towards me; this was about eight o'clock in the morning; I shut the door, and the defendant opened the door and slammed it back (I mean the front basement hall door); I then went in my room; I was then occupied in getting my washing ready, and had to go out and in; the draft from the front door was too much for me; then I went slowly and softly, in order not to disturb the doctor (defendant) and shut the door again slowly; as I returned to my room and passed his door, he came out of his room the second time, and slammed the hall door back again; talked a few words; I paid no attention to it, because I was not excited; when I went out the second time, the doctor's room door was open about a foot, on ajar; I could see him plainly

in his room; I tried to go to my work again, and was in and out, as I had to wash before the rear door; my room door was open, and I had to go in and out to prepare for washing; my husband was in the rear room occupied with the child; the draft was too much; and then my husband went out and saw that the draft was too strong, and he went and wanted to shut the door; I saw him, and was going after him, but he had already passed the doctor's door, and my husband wanted to take hold of the handle of the door with his left hand, when the doctor came out, not fully dressed, with his pantaloons on and a white shirt, and, if I do not err, a black vest, and went quickly, with brisk paces, towards the door, his right hand laying against his side, having some object in his hand, and took hold of the door with his left hand, as if he wanted the door open; my husband said, "Let the door be closed," or "the door must be closed; let now the door be closed;" and as he spoke thus, the doctor already stabbed him into his left side; my husband let the door slip, and seized hold of his own breast with both hands; he was then turning his back somewhat towards me, and came quickly towards me, and I stepped a step forward, and he said, "God! I am stabbed; he has stabbed me;" then we went into our room, and I asked him, "Is it hard?" (I meant if he was badly stabbed); my husband said, "Yes, yes, the blood is already running inside;" I went to Ninth street to get Dr. Klein, and when I came back my husband was dead; he might have still lived a little; I had been gone about six minutes; afterwards a physician (Dr. Schwartzenberg) came a little while after the stabbing occurred; I can't tell the time; the people told me my husband was already dead. The district attorney asked the witness the following questions:

*Q.* Do you know who locked the door the night before?

*A.* My husband did.

*Q.* Did you see him lock it?

*A.* No; I saw him go out with a light, and I heard him lock the door.

*Q.* Did you hear the defendant say anything at that time?

Counsel for defendant objected to this question. The court overruled the objection and allowed the question to be answered, to which decision counsel for defendant excepted. The witness then answered, no, neither he nor my husband said anything; when prisoner made motions to my husband, I saw him make more than two; after deceased was stabbed, I immediately returned to defendant's door, and said, "you, fellow, thou hast stabbed my husband;" he replied, "yes, yes;" then I screamed, "Miss Smith, my husband is stabbed;" the doctor said something else at the time, which I could not understand; I was too much excited; in my opinion, as much as I can think, he said something like, "he ought to have left the door open," or something of that kind; I don't remember anything else; no one else was present but I, deceased and prisoner; I saw something in defendant's right hand, of that length (about a foot); it did not look very dark nor very bright; I saw something bright behind the hand.

*Cross-examined* by counsel for defendant. I am certain as to the time; it was near eight o'clock, not later or earlier; the sun did not shine that morning; it was a dark morning; there is a small glass window running down on one side of the door; the deceased stood with his right side toward the window, the light somewhat toward his back; this window is not quite a quarter of a yard wide; it runs from the knob of the door up to the top of the door; it was, perhaps, very dirty; I had not cleaned it for a long time; I cannot say if the rear door was shut or not; we most always kept the rear door shut; we went in and out of the rear door; the back door was not always open or shut; we kept it shut as much as possible; there is not another door leading to the street, or a back way; the defendant's room was on the right side of hall going out; same side as my room; from the time I first shut the door, to the time deceased was stabbed, it was, perhaps, half an hour; I can't tell; I paid no attention to the time; it was a half or three-quarters of an hour, not an hour; I first shut the door about half-past seven; somewhere about that time, perhaps later; I saw my husband go out to shut the front door; he

Lowenberg v. The People.

passed me; I stood near my door, a foot or two from it; as soon as he passed out the door about two paces, I followed him; he did not go rapidly; he went his ordinary pace; as soon as he started, I did not try to overtake him, nor at any time; after my husband went to the front door, I did not go to the front door; when he was stabbed, I was, perhaps, one pace from my door, and was looking toward the front door; I did not follow my husband; from my door to the front basement door, is about as far as from here to the stove (about thirty-five feet); when the defendant went to his room after stabbing my husband, I stood in the same place; I can't say if the rear door was open or shut at the time; my husband had closed the door when he was stabbed; it was dark; as defendant came out of his room, door was not quite shut; my husband was in the act of shutting it; I saw defendant's side face, left side; I could only see his left side, but, as he turned, I perceived the object; he held his left hand down in the act of seizing something; I did not see his left hand up; I saw his left hand; there was nothing in it; nothing to draw my attention to his left hand; I had no idea of anything wrong; there was nothing to attract my attention except his (defendant's) coming out; when he came out the door, it struck me he had his right hand leaning against his right side; it was not free; his arm was a little turned; when he came out he went right to the front door; from doctor's door to front door, was about as far as from here to that door (about ten feet); he went in a very quick pace, not running; I saw the deceased pass doctor's door on his way to the front door; doctor was not out; the handle to the front door is on right side of door going out, same side as doctor's room; as the doctor came out of the door, I saw the deceased had hold of the front door with his left hand, closing it; as doctor reached the front door, the first I observed, the doctor took hold of the front door and wanted to push it back: I can't tell if he took hold of the edge of the door with his left hand; he turned a little, and, as he did so, he moved his right hand; my husband stood nearest the door; the exact words deceased used were,

"now let the door be closed;" he spoke in a loud voice; he spoke loud usually; I heard it; I saw no blows struck; I saw the motion of the defendant's hand more than once, certainly twice, it may have been three times; then my husband turned, and I saw that the doctor stood with his back toward the door, and my husband was coming back; I did not see them (defendant and the deceased) grappling; I did not see if either of them had hold of each other; they did not take hold of each other; I could see clearly and distinctly if they did or did not.

Q. Did you swear before the coroner that it was somewhat dark in the hall, and you could not see very distinctly?

A. Yes; I said so; it was somewhat dark, but I could see, but not very distinctly; when I said to doctor that he stabbed my husband, he said, "he ought to have left me alone, or he ought to have staid away;" I cannot tell the words he used; he said he should have let me alone, or some such expression; defendant did not say to me, "he ought to have let go of me." Did you swear before the coroner that at this time the doctor said, "he ought to have let go of me," or, "he ought to have let me alone?

A. No; I cannot remember.

[The district attorney admitted that she so swore before the coroner.]

The defendant generally had a cane when he went out; I paid attention to that; after deceased was stabbed, I did not look on the floor for anything; I don't know where that cane is; I have not seen it since; I could not say what it was the doctor had in his hand; I could not see any color to it; I cannot say it was bright or dull; I saw something behind his hand; I could have seen it if it was like that (a cane shown to witness); when defendant was turning, I saw something about so long; I could not say it was bright, dull, or what color; at that time I had no idea as to what it was; after I shut the door the first or second time, I told my husband that the doctor had opened the door again; I only told him once that the doctor had slammed it open; I said to my husband,

Lowenberg *v.* The People.

" now, look, there he is slamming the door open again; " my husband said nothing; he was not angry; I don't recollect anything he said; he said nothing; I don't remember if I said anything else to my husband before he went out; he went out in a minute or two after; I shut the door that morning twice; three or four minutes elapsed between the first and second time; I cannot tell how long it was from time I shut it to time my husband shut it; it was five or six minutes — perhaps longer.

*Q.* When you told your husband that defendant had shut the door, did your husband say, " does he want to tantalize us all the time; now I am going to shut the door myself? "

*A.* He said, " now I am going to shut the door! " I cannot remember if he said, " does he want to tantalize us all the time; " when my husband said he was going to close the door, I said, " wait, I will tell the landlord first; " the deceased was at the door then; when my husband came back, he came on the same side where our rooms are; at the front door the defendant was towards the door; the deceased was very near the doctor's door at the time.

*Dr. George Swartzenberg* was called as a witness on behalf of the prosecution, and, after being duly sworn, testified as follows:

I was called to see the deceased; got to 141 First avenue, between eight and 9 o'clock; I found him dead; I examined the wounds on him.

*George B. Bouton* was next called as a witness on behalf of the prosecution, and after being duly sworn, testified as follows:

I am a physician; I made a *post mortem* examination of the deceased; I found three stab wounds, one an inch above the right nipple, one an inch and a half from the left of the medium line opposite the spine, between the third and fourth rib, and about one and a half inches obliquely, extending upwards and outwards, from the left nipple; the first wound perforated one of the ribs, but did not injure the lung; the second wound passed through the pericardium and the ascend-

ing aorta, and ending by the side of the vertebral column; the third was merely muscular, about one a half inches deep, and in the tissues; it was of no consequence; it was one and a half inches upwards and outwards from the left nipple; I found hemorrhage from the second wound had been great, and death was occasioned by it; the second wound, in the order of description as I have given it; I examined the organs; there was some adhesion of lungs, and tubercular deposits of the left lung; all the other organs were healthy.

*Cross-examination by counsel for defendant:* The tubercular deposits were indicative of consumption; these wounds would have been produced by a small cane like this; the first wound was one inch in depth, the second six inches in depth, and the third about two inches in depth; the second wound produced death; the third wound could have been made as quick as thought, almost; there was nothing in the wounds to indicate the time occupied in inflicting them.

*John McDermott* was then called as a witness on behalf of the prosecution, and, after being sworn, testified as follows: I am a police officer, attached to the 17th precinct; I first heard of this murder on the morning of the 14th November last; I went to No. 141 First avenue; I inquired who was murdered; I found the prisoner and brought him to the station house, and I asked him if he stabbed the deceased; he said it was my business to find out, or something to that effect; I searched him, and asked him what he done with the weapon he stabbed the man with; he said he had no weapon; he wanted to know if he could not get out on bail; I told him no, I did not suppose he could, that it would be brought before the grand jury; I asked him why he killed the man; he said he had not; I said, you must have killed him; he said I had no right to call him a murderer; I said, from the circumstances I did not hesitate in saying that he murdered the man; I was about to take him down stairs; he asked me to go for bail; he said Collector Barney would go bail for him; he said, "I am a gentleman," and that I had no right to call him a murderer; he said if he had left the front door closed, that nothing of the

kind would have occurred; the prisoner said, had he (deceased) left the door open it would not have occurred; I asked him if shutting and opening the door caused the quarrel; he said that was the cause of the occurrence; I said, you must go down to the cell; he then took off his hat and said he was struck by this man Hoffman and abused, and what he did was in self defense; he said deceased had struck him in the face; I examined him; found no marks, except that the skin was in the least bit ruffled over the left eye, so you could take notice of it on close examination; he asked me if he had not a right to defend himself, when assaulted; I told him the police headquarters was the place, and not to take the life of an assailant at so frivolous an offense as that; I then took him down stairs; I locked him up in a cell; I then returned to 141 First avenue, and there found this cane sword; it was the only sharp instrument I found, except an old table knife; when I brought him to the station house, I examined him to find blood; I found a stain of blood under the finger nail of the forefinger and thumb of his left hand; no other stain.

*Cross-examined by counsel for defendant:* I found that cane sword on a table in the prisoner's room; I saw no cane about there; I made a thorough search through the hall and in the doctor's room — no other room; I looked on the hall floor; I lit a candle and looked; I went to make the search about half past eight o'clock; prisoner asked me to try to find the cane part of the sword; I also looked in deceased's room; I just glanced around; the mark on defendant was on forehead, about the size of the end of your finger; the skin was a little ruffled and red; I examined no further; I did not feel of his head to see if it was bruised; defendant said, had not a man a right to defend himself against an assailant; I swore before the coroner that defendant said he did it in self defense — that deceased assaulted him; he said, what he did he did in self defense; I told him I had no hesitation in calling him a murderer and saying he murdered the man; when I asked him, and he said it was my business to find out, I plied him with questions as to what he had done, and why, and with what he had done it;

I made the arrest at eight o'clock and fifteen minutes ; I searched the defendant, and found on him a watch, a port monnaie and two bank books.

*Redirect examination by district attorney:* The mark on his forehead might possibly have been produced by a hat, but it is not probable ; it was a round mark, not such a mark as a hat produces ; there was no blood on the weapon I found.

*Recross-examined:* The sword is in the same condition now as it was then.

The prosecution here rested their case.

*Rev. Samuel M. Isaacs* was then called as a witness on behalf of the defense, and testified as follows : I am a clergyman, of the Jewish persuasion ; I have known the defendant about five years ; during that time I have known him by his bringing to me sums of money for the poor; I did not know his name ; he would not give his name ; in that way I became acquainted with him ; I only know his character from observations I heard other people make within six months; so far as I know, his character for peace and quietness is good.

*Mrs. Barney* was then called as a witness on behalf of the defense, and testified as follows : I am the wife of Hiram Barney, collector of the port of New York; I have known the defendant since about two years ; he was a private tutor in my family about two years ago; he taught one winter, and one month this fall, and last November about ten days ; as far as I know, I considered him a peaceful and gentlemanly person ; I have heard him spoken of as a remarkably peaceable and quiet man.

*Matthew Morgan* was called as a witness on behalf of the defense, and testified as follows : I have known the defendant about three years ; he was a tutor in my family two winters ; as to his character, I never knew anything against it ; he was very kind in his treatment to others ; he taught Greek, Latin and German in my family.

*Cross-examination:* I never heard his character called in question.

*Henry Smith* was next called as witness on behalf of the

Lowenberg *v.* The People.

defense, and testified as follows: I am a physician; I have known defendant about four years and a half; he was introduced to me as a teacher of German; he taught me the German language, from four and a half years since until now; I have known him the greater part of the time; as far as I know and have heard, his character for peace and quietness has been good.

*Cross-examination by district attorney:* I only know his character from personal observation.

*Redirect examination:* I met him every morning for one hour, and at other times, at Astor Library.

*Abraham Sweet* was next called as a witness for the defense, and testified as follows: I am employed in the New York post-office; I have known the defendant ten years; have seen him occasionally for the last four or five years; I knew him in Poughkeepsie; he was then a professor, or teacher; at that time I had occasion to inquire as to his character; it was good as to peace and quietness; his character was that of a very quiet man; as far as I know, it has been so since.

*Cross-examined by district attorney:* Since he has been here, I have no knowledge as to his character.

*William H. Franklin* was next called as a witness on behalf of the defense, and testified as follows: I am a member of the firm of Hasbrouck & Co.; I have known the defendant four or five years; I employed him as German tutor; I employed him nine or ten months; I have known him since, and have occasionally met him and those with whom he is acquainted; I know two or three gentlemen with whom he is acquainted; I have always considered him a quiet and peaceable man.

*Cross-examined by district attorney:* He was introduced to me; I never heard his character questioned.

*E. P. Fowler* was a witness on behalf of the defense, testified as follows: I am a physician; I have known defendant six to seven years; his character for peace and quietness was good; he seemed always to be peaceable.

*Edwin M. Kellogg* was called as a witness on behalf of the defense, and testified as follows: I am a physician; I have

known defendant four and a half years; I became acquainted with him as a teacher; I have known nothing against him; my acquaintance with him has always been pleasant; his character is good.

*Gustave Sellin* was next called as a witness on behalf of the defense, and testified as follows: I have known defendant twelve years; I first knew him in Cincinnati, Ohio; he was a physician there; he was my physician; I was very intimate with him; I knew them that were acquainted with him; his character for peace and quietness was very good.

*Adam Gulich* was next sworn as a witness on behalf of the defense, and testified that he kept a boarding house, 79 Bowery; knew defendant three years; knew him as a quiet, sober man — very peaceable and quiet, from what he saw of him.

*Alexander Marcus* was next called as a witness for the defense, and testified as follows: I am in the segar business; I knew defendant four or five years; saw him almost every day; his character was that of a very peaceable, quiet man.

The defense here rested the case.

*Mrs. Catharine Herloch* was then called as a witness on behalf of the prosecution, and testified as follows: I know the defendant about two years; I leased him a room at 43 Marion street, a front basement in my house; I have heard people speak of him; I know his character from that — that he was always quarreling with the tenants in the house; he was not a man of violence, that I know of; I don't know anything as to his temper; I don't know anything more.

*Cross-examined by counsel for defense:* I kept a poultry stand in a market; I never knew defendant to strike any one; he struck my children; I did not see him; he struck me.

*Redirect examination by district attorney:* He threatened to kill my son.

*Recross-examined by counsel for defendant:* I did not strike him; I heard him threaten to kill my son; he said, "I'll kill that damned boy;" he did not strike him; there was no dispute between him and me about my children blackguarding

him and throwing pails and baskets at him, or placing fish in front of his door.

*Redirect examination by district attorney:* My son is sixteen years old; I never saw defendant use a sword-cane; he had a cane.

The testimony on both sides was here closed.

Counsel for the defense and prosecution respectively summed up the case to the jury.

The counsel for the defense requested the court to charge the jury that unless the killing of deceased, by the prisoner, was willful, deliberate and premeditated, the jury should not convict the prisoner of murder in any degree.

The court refused so to charge, and the counsel for defense excepted.

In respect to this proposition, the court charged the jury that the same was true as to murder in the first degree, but not as to murder in the second degree. But as to murder in the second degree, the court charged as hereinafter stated, and to so much of the charge as related to murder in the second degree, the counsel for the defense excepted.

The counsel for defense requested the court to charge the jury that an intent to take life, formed at the instant the fatal blow is struck, is not sufficient to constitute murder, unless such intent be willful, deliberate and premeditated. The court refused to charge in these words, and counsel for defense excepted.

In respect to this proposition, the court charged the jury as hereinafter stated, and the counsel for defense excepted.

The counsel for defense requested the court to charge the jury that, if the jury believed from the evidence in this case that the prisoner, at the time of the infliction of the stabs, by him, upon the deceased, did not entertain a premeditated intent to kill, they should not convict him of murder.

The court refused so to charge and the counsel for defense excepted.

In respect to this proposition, the court charged the jury that it was true as to murder in the first degree; and as to

murder in the second degree, the court charged as hereinafter stated, and to so much of the charge as related thereto, the counsel for defense excepted.

The counsel for defense requested the court to charge the jury that, if the jury believed, from the evidence, that the prisoner intended only to inflict upon the deceased, bodily harm, without any intention to take the life of the deceased, they ought not to convict him of murder in the second degree. The court refused so to charge, and defendant's counsel excepted. In respect to this proposition, the court charged the jury as hereinafter stated, that, if the blow was with a dangerous weapon, and the intent malicious and death resulted, it would be murder in the second degree, unless done in the heat of passion, upon sufficient provocation. To which counsel for defendant excepted.

The counsel for defense requested the court to charge the jury, that if the prisoner was only guilty of the involuntary killing of deceased by means of a sword-cane in the heat of passion, the jury should not convict of any higher offense than manslaughter in the fourth degree.

The court refused so to charge, and the defendant's counsel excepted.

In respect to this proposition, the court charged the jury that if the weapon used was a dangerous weapon, they might convict of a higher degree of manslaughter than the fourth; and to this portion of said charge, the counsel for the defense excepted.

The counsel for defense requested the court to charge the jury, that if the prisoner is proven, by the evidence, to have been guilty of killing the deceased, in the heat of passion, by a sword-cane, without a premeditated design to effect death, the jury should not convict of any higher degree than manslaughter in the third degree.

Upon this proposition the court charged as hereinafter stated, and refused to charge otherwise.

The counsel for defense excepted to such refusal, and also

Lowenberg. v. The People.

excepted to so much of said charge as related to manslaughter in the third degree.

The court charged the jury at length, as follows, viz. :

Gentlemen of the jury: The prisoner at the bar, Moses Lowenberg, stands indicted for murder in the first degree. The taking of human life, under any circumstances, is a terrible thing — the taking it with malice and design is very terrible, indeed. Your duty as jurors is a solemn and responsible one, and the close attention you have given to the details of this case, assures me that you find it to be so.

It is proper that in the outset of my charge I should briefly review the evidence in the case. When I have done that, and instructed you upon the law, you will do your duty without regard to the consequences which may ensue. Moses Lowenberg is charged with the murder of Hoffman, on the 14th day of November, 1861. It seems from the evidence that they lived in the same house, 141 First avenue. The prisoner occupying the front basement room, and Hoffman and his wife the rear basement rooms. The location of these rooms, as well as of the rear hall door and door leading to the street, you understand perfectly from the explanations given. Mrs. Hoffman states that on the morning of the 14th of November, she went out of her room, through the hall, and closed the street door, which had been open; that immediately after she had closed it, the prisoner came out of his room and opened it again, slamming it back; that in a few minutes she went and closed it again; that the prisoner again came out of his room and threw it open. As she passed the second time to close the door, the prisoner's door was ajar, and she saw him sitting in his room. A few minutes elapsed between the shutting of the door the first and second times. After the lapse of some minutes from the second time (she thinks five or six minutes, but is not certain), her husband said, I will go and close the door. She said to him, "No, wait and I will see the landlady about it." She adds that as she said this her husband was already out; I saw him go toward the door; he had his left hand upon the door to close it, when the prisoner came

out of the room, having some object in his right hand; she could not see what it was, nor could she tell the color. There has been some difference between prisoner's counsel and the district attorney, as to what she did say about seeing "something bright." In the latter part of her direct examination, she said, as appears by my minutes, "I saw some article about a foot and a half long; it did not look very bright or very dark; I saw something bright behind the hand; it was dark near the door, and I could not see well."

She says her husband had his hand on the door to close it. The prisoner also put his hand on the door, and the next thing she saw was a motion of the prisoner's right hand, thus (illustrating), and her husband starting back, throwing both his hands upon his breast, told her he was stabbed. He went into their room. She asked him if he was stabbed hard. He said "yes, the blood is now running inside," referring, I suppose, to what the doctor called internal hemorrhage. Such, gentlemen, is her simple statement.

On her cross-examination, she was asked a great many questions, having reference mainly to the degree of darkness which pervaded the hall, and as to whether she could or could not see distinctly. You have heard all her testimony, and will judge for yourselves whether she could or could not see what transpired, and it will be an easy matter for you, on all the evidence in the case, to determine whether the prisoner had in his hand this sword-cane, whether he stabbed the deceased with it, and whether death was the consequence of the wound.

A number of questions were put to Mrs. Hoffman for the purpose of ascertaining from her whether there was any grappling in the hall, any seizing hold of each other by the two men. She says she did not see any, and that if there had been she could have seen it. Now, there is no evidence of any wound having been inflicted by the deceased upon the prisoner, unless it be the mark upon the prisoner's forehead, to which he called the attention of the officer when he was arrested, and in connection with which prisoner stated that

Lowenberg *v.* The People.

what he did was in self defense, and that he was assaulted. I do not recollect any other evidence upon this point; if there is, you will recollect it, and the prisoner's counsel can now call attention to it.

Now, if the prisoner did have the sword-cane, if he took it from his room into the hall, if while there he stabbed Hoffman with the sword, and from the wound Hoffman died, are there any other facts proven which show the act to be excusable or justifiable, or which would reduce the killing to manslaughter? If there are no such facts, and the intent to take life existed, it is under the law, as I shall explain it to you, murder. The facts in the case are few and easily got at. There is but one living witness who saw the whole transaction, and she has given to you her statement, and it is for you to determine the degree of consideration to which it is entitled. You will, of course, gentlemen, bear in mind the prisoner's own statements in respect to the facts which occurred. They are before you, and are evidence in the case. The prisoner's counsel has requested me to charge you, that inasmuch as the prosecution have drawn out these statements, that it is bound and concluded by them. This is not so. They are evidence, and are to be considered in connection with all the other evidence in the case, and it is for you to determine which is true, the prisoner's statement or those of Mrs. Hoffman. I will make no further reference to the evidence, except such as bears upon the question of character.

You have heard witnesses on part of the prisoner testify that they knew him as a peaceable and quiet man. You have also heard one of them, a woman, say that he was quarrelsome, had struck her children, had struck her, and threatened to kill her son. The good character of a prisoner is always a proper subject for the consideration of a jury, and is to be taken into consideration, not only in case where doubt of guilt exists, but it may sometimes of itself generate a doubt in the mind of the jury. This is what prisoner's counsel has requested me to charge, and I charge the proposition as fully as he requests. But, gentlemen, you will perceive at once

that where a clear case of guilt is made out on the proof, evidence of good character is of comparatively little importance. Having thus reviewed the evidence in this case, I will explain to you the law applicable to the facts proven.

The taking of human life, with premeditated design and with malice, is murder; such is the common law definition, and about the briefest one I can give you. The legislature of this State, by the law of 1860, divided murder into two degrees. It declared " that all murder which should be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration, or the attempt to perpetrate, any arson, rape, robbery or burglary, or in attempt to escape from imprisonment, shall be deemed murder in the first degree, and all other kinds of murder shall be deemed murder in the second degree; and it is made the duty of the jury, if they find a man guilty, to specify in the verdict whether it is of murder in the first or second degree.

This law is pretty nearly, if not exactly, a transcript of the Pennsylvania statute. The courts in that State, in construing the law, have held that there could be no murder in the first degree (except in the cases particularly specified in this act), unless there was the specific intention to kill. They have held that where there is malice and a willful, deliberate and premeditated intent to take life, and death ensues, it is murder in the first degree. but if the intent is not to kill, but to do bodily harm merely, and death ensues, it would be only murder in the second degree. In this case, the district attorney, construing the law of 1860 in its most liberal aspect, has claimed and stated it to be, that to constitute murder in the first degree, there must be some deliberation and premeditation preceding the act, that the mere striking of a blow, with intent to kill, is not sufficient, unless it is done after some deliberation, and if that is lacking, though the intent to kill exists, it is only murder in the second degree.

But, gentlemen, if you find that premeditation and delibera-

Lowenberg *v.* The People.

tion existed, it is of no consequence how long it may have preceded the fatal blow. It is sufficient if it came into existence with the intent to kill on the instant of striking the blow. But, though there is the intent to kill, if you are satisfied the mind did not deliberate, then it can only be murder in the second degree. I say if there is an absence of deliberation, if there is merely the intent to kill, formed on the instant, it would be murder in the second degree. I charge the law in this way because it is all the prosecution asks. It is not as strict as laid down by the court of Pennsylvania, and not as strict as I would charge if the district attorney had asked it.

Upon this point the counsel for the prisoner has requested me to charge, that unless the killing of the deceased by the prisoner was willful, deliberate and premeditated, the jury should not convict the prisoner of murder in any degree, and that the intent to take life, formed at the instant the fatal blow is struck, is not sufficient to constitute murder, unless such intent be willful, deliberate and premeditated. These propositions, as stated by the counsel for the prisoner, are not correct, because, as you perceive, they claim, that except as therein stated, there can be no conviction for *murder in any degree.* I have explained to you what the law is upon this subject, and it is unnecessary for me to repeat what I have said. Now, all homicide which is not excusable or justifiable, is, under our statute, either murder in the first or second degree, or manslaughter in some of the degrees. Let us first see whether, under any view of this evidence, this is a case of either excusable or justifiable homicide. There is a distinction between the two, and I do not know that the prisoner's counsel claims that this case is under either of the statutory definitions of excusable homicide. Homicide is excusable:

*First.* When committed by accident and misfortune in lawfully correcting a child or servant, or doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent.

*Second.* By accident and misfortune in the heat of passion,

upon any sudden and sufficient provocation, or upon a sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner.

It cannot be claimed that this case comes under this sub division. It is conceded that the weapon used was a sword cane, and I need not say that it can hardly be denied that such a weapon is a dangerous one to plunge into a vital part.

Homicide is justifiable under our statute in the following cases: (The judge here read the statute relating to justifiable homicide.)  It is not claimed that the deceased, Hoffman, was attempting to murder the prisoner, or to commit any felony. But prisoner's counsel refers to the prisoner's own statement to the policeman, that what he did was in self defense. The courts in this State have laid down this rule, viz., that one who is without fault himself, when attacked by another, may kill his assailant, if the circumstances be such as to furnish reasonable grounds for apprehending a design to take away his life, or do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design would be accomplished, although it may afterward turn out that the appearances were false, and there was, in fact, no such design, nor any danger that it would be accomplished.

Before you can find this homicide to be justifiable, on the ground that it was committed in self defense, you must therefore find, that prisoner being without fault himself, was attacked by Hoffman under such circumstances as to furnish reasonable grounds for apprehending a design to take his life, or do him some great bodily harm, &c. It is for you, gentlemen, to say whether there is any evidence to show such a state of facts; if there is, you are bound to give it consideration. The courts have said that a blow with a naked hand does not justify one in returning the blow with a dangerous weapon; and if you find Hoffman did strike prisoner with his hand, it would not justify prisoner in returning the blow with the sword-cane, where there was no reason to apprehend any danger. There

is no evidence to show that Hoffman was armed. Nor is there evidence to show the comparative strength and power of the two men. Having defined to you the law of murder, and explained to you what homicide is excusable, and what is justifiable, I will instruct you upon the law of manslaughter, so far as it can have any possible bearing in this case. I need not define to you manslaughter in the first and second degrees, it being conceded that this cannot be either one or the other.

The prisoner's counsel has urged that this case may be one of manslaughter in the third or fourth degree. The statute relating to manslaughter in the third degree, so far as it can by any possibility have any application to this case, is as follows, viz.: "The killing of another in the heat of passion, without a design to effect death, by a dangerous weapon, in any case except such where the killing is declared to be justifiable or excusable, shall be deemed manslaughter in the third degree." There must, you perceive, be the heat of passion, and the absence of any design to kill. By the heat of passion is not meant merely anger, it is rather what is commonly understood as fever heat; passion excited in such a degree as to deprive a man of his self control. A man may be in anger and yet not be in this heat of passion. If a man in this heat of passion, upon provocation, strikes a blow without intent to kill, and death ensues, he is guilty of manslaughter in the third degree. Now, if you consider whether the prisoner at the bar is guilty to this degree, the first thing you have to ask, as conscientious jurors, is, was he in the heat of passion? and I have explained what that meant. If he was, what provoked it? Was it the mere shutting of the door? was there sufficient provocation? did he design to effect death or not? If he designed to kill, as I have explained to you, it is not manslaughter in the third degree.

The prisoner's counsel claims that the case may come within the statutory definition of manslaughter in the fourth degree, as follows, viz.: "The involuntary killing of another, by any weapon or by means neither cruel nor unusual, in the heat of passion, in any cases, other than such as are declared to be

excusable homicide, shall be deemed manslaughter in the fourth degree." You will perceive in the definition of manslaughter in the third degree, there is enumerated " heat of passion," " absence of design to kill," and the " use of dangerous weapon." In the fourth degree the words are " involuntary killing," and " any weapon." Now, gentlemen, if this is not manslaughter in the third or fourth degree, and is not excusable or justifiable homicide, then determine whether it is murder in the first or second degree. As I have said to you before, the taking of human life is a serious matter, and must be dealt with seriously. If a man uses a dangerous weapon, and strikes a blow calculated to produce death, the law presumes that he intends the natural consequences of his act. The presumption in law is that it is done with malice, and it is for you to say whether there is anything proven in this case to rebut or change that presumption.

The prisoner's counsel has requested me to charge upon certain propositions; part of them have been covered by what I have already said. He asks me to charge that the prosecution having proved that the defendant stated, immediately after the stabbing of deceased, that he did it in self defense, have made that statement evidence. I have already so charged you. You are the judges of the facts, and are to render your verdict upon all the evidence before you. He also requests me to charge that if the jury have any reasonable doubt, on the evidence, as to whether defendant is guilty of murder or manslaughter, they ought not to convict of the higher offense; and if they have any doubt as to whether the defendant is guilty of manslaughter or whether the killing was in self defense, they should acquit him.

These propositions are undoubtedly correct. You are bound to give the prisoner the benefit of every reasonable doubt. He also requests me to charge, that if the prisoner is proven by the evidence to have been guilty of killing deceased in the heat of passion, with a sword-cane, without a premeditated design to effect death, the jury should not convict of any

higher offense than manslaughter in the third degree. I have already charged you that in substance. He also asks me to charge, that if the jury have any reasonable doubt arising, on the evidence, as to whether defendant is guilty or not of manslaughter in the third or fourth degree, they should (if they convict at all) convict only of manslaughter in the fourth degree. I have already charged you that upon any point upon which any reasonable doubt exists, the prisoner is entitled to the benefit of it.

The case, gentlemen, is with you. You are to decide of what offense, if any, the prisoner is guilty. If you find as matter of fact, that there was a mere dispute about opening a door, that the deceased went to close it, that the prisoner followed him with a sword-cane in his hand, it is for you to determine the purpose for which he did it. He has offered you no explanation in evidence on that point. It was not necessary for the opening or shutting of the door. If he carried it out with him, and then, upon a quarrel as to whether the door should be open or shut, struck three blows with it, which caused the death of the deceased, it is for you to say whether he is guilty of murder; if not what he is guilty of. There was, I have before stated, but one living witness to the transaction, and you have heard her story.

The doctor has told you that the second wound extended six inches into the body, and that the man died from the internal hemorrhage in a few minutes. Do you believe, on the evidence, that when the prisoner plunged this sword-cane three times into the deceased, he meant to kill him? If he meant to kill him, did he do it with premeditation and deliberation? If he did, it is, under the statute, murder in the first degree. If there was not that deliberation and premeditation I have before mentioned, it is murder in the second degree. If the act was willful, premeditated and deliberated, and the intent was not to kill, but to do bodily harm, and death ensued, it is, under the statute, murder in the second degree. If the act was done upon provocation, such as I have described, and in the heat of passion, without a design to kill, it would be manslaughter in

the third degree; but if not in the heat of passion, and if it was with a design to effect death, it cannot be manslaughter, it must be murder. I. shall say nothing further in the case. It is for you now to determine it upon the evidence before you.

The jury thereupon retired, and soon after came into court and rendered a verdict of guilty of murder in the first degree.

Subsequently, and on the fourth day of January, 1862, the counsel of said defendant, Moses Lowenberg, moved the court in arrest of judgment. The court denied the motion, to which decision counsel for defendant excepted.

After judgment, a writ of error was sued out, and the case removed into this court for review.

*Henry L. Clinton,* for plaintiff in error.

I. The plaintiff in error was, on the 11th of December, 1861, sentenced by the court below to suffer death on the 20th of February, 1863, and to be imprisoned in the State prison until such punishment should be inflicted. There is no authority in law for pronouncing any sentence upon a conviction for murder in the first degree, that being the offense of which the prisoner stands convicted.

The death penalty is abolished; and while the punishment for murder in the second degree, and manslaughter in the first, second, third and fourth degrees, is defined with precision, there is an entire omission in regard to murder in the first degree.

That portion of the Revised Statutes (§ 1 *of title* 1, *ch.* 1, *part* 4) which provides that those convicted of certain crimes, including murder, "shall suffer death for the same," is abolished, by being amended so as to read, that those convicted of those offenses "shall be punished as *herein* provided." The words, "shall be punished as herein provided," are substituted for the words, *shall suffer death.*" (3 *R. S.,* 935, § 1, 5*th ed., Laws* 1860; *pp.* 713, 714, § 7.)

What is the meaning of the words, "shall be punished as herein provided?"

The only punishment *therein* provided, was section twenty-

five, which is as follows: "The punishment of death shall in all cases be inflicted by hanging the convict by the neck until he be dead."

This section is expressly abolished. (*Laws* 1860, *p.* 714, § 11.)

The enactment that those convicted of murder "shall suffer death for the same," is, in effect, abolished by being so amended as to strike out the words, "shall suffer death."

The provisions of the Revised Statutes, as to hanging, are expressly abolished. There was, then, when the prisoner was tried and sentenced, no punishment for murder, unless such provision is contained in the act of 1860.

This act nowhere provides that death shall be inflicted for any offense.

It expressly provides that certain crimes shall *not* be punishable with death. Section one says: "No crime hereafter committed, except treason and murder in the first degree, shall be punished with death in the State of New York." This provision is, that crimes other than treason and murder in the first degree, shall *not* be punished with death, not that treason and murder in the first degree shall be punishable with death.

Section four provides, that "when any person shall be convicted of any crime punishable with death, and sentenced to suffer such punishment, he shall at the same time be sentenced to confinement at hard labor in the State prison until punishment of death shall be inflicted."

This section does not say what crimes (if any) shall be punishable with death.

This section is utterly nugatory, unless some other section provides, in express terms, that some crime or crimes (specifying the same) shall be "*punishable with death.*"

There is no such section in the law of 1860, and the sections of the Revised Statutes which so provided are expressly abolished.

Section 5 of the act of 1860 is as follows: "No person so sentenced or imprisoned shall be executed in pursuance of such sentence within one year from the day on which such sentence of death shall be passed, nor until the whole record of the

proceedings shall be certified by the clerk of the court in which the conviction was had, under the seal thereof, to the governor of the State, nor until a warrant shall be issued by the governor, under the great seal of the State, directed to the sheriff of the county in which the State prison may be situated, commanding the said sentence of death to be carried into execution." This section provides that no execution shall take place until after certain things are done. It does not provide that execution shall then or ever take place.

The 1st, 4th and 5th are the only sections which speak of punishment by death. None of these provide that any crime shall be punished with death.

The utmost that can be contended with plausibility, on the part of the prosecution (and even this is doubtful), is, that these sections presuppose the existence of other sections providing, in *express terms* (not by implication, deduction or inference), that those convicted of "treason and murder in the first degree" shall suffer death, and that the mode of death shall be in a particular manner, to wit, by hanging, or in some other manner defined with certainty and precision.

It is enough to say that no such provisions can anywhere be found upon the statute book (I make no allusion to the law of 1861, which can have no bearing upon this case); but, on the contrary, all the provisions which, within the rule of statutory construction, did contain anything of the sort, are expressly, and in unmistakable terms, abolished.

It is clear, from the Revised Statutes, the Laws of 1860, and the well recognized and inflexible rules of construction of statutes, that the court possesses no power to sentence on conviction for murder in the first degree, for the simple reason that there is no punishment for that offense provided by law.

There is no power to sentence to imprisonment in the State prison, under section 4 of the act of 1860, because that act provides that such a sentence can be inflicted only "*when* any person shall be convicted of any crime *punishable with death*."

Inasmuch as there was, when the prisoner was sentenced, no "crime punishable with death," there is no authority of law

to sentence to imprisonment in the State prison, or to impose any other punishment for this offense.

. II. The inflexible rule, that penal statutes are to be construed strictly, renders it logically, legally, inevitably certain, that the power of punishment by death cannot be deduced by implication or inference, and that no such power exists in this case.

The attention of the court is invoked to the following, among the numerous authorities upon this point, illustrating the inflexibility of the principle:

" Penal statutes receive a strict interpretation. The general words of a penal statute shall be restrained for the benefit of him against whom the penalty is inflicted." (*Dwarr. on Stat.*, 634.) This author also very correctly observes (pp. 634, 635), " A penal law, then, shall not be extended by equity; that is, things which do not come within the words, shall not be brought within it by construction. The law of England does not allow of constructive offenses, or of arbitrary punishments. No man incurs a penalty, unless the act which subjects him to it is clearly both within the spirit and the letter of the statute imposing such penalty." " If these rules are violated," said BEST, Ch. J., in the case of *Fletcher* v. *Lord Lindes*, " the fate of accused persons is decided by the arbitrary discretion of judges, and not by the express authority of the laws."

Penal statutes must be construed strictly as against the citizen; and it is not sufficient that the offense charged be within the mischief which the legislature intended to prevent or redress, if it be not within the words which they have used.

Therefore, where a statute prohibited, within certain limits, the erection of wooden buildings and of wooden additions to buildings already erected, having in them a chimney or fire place, and the party had erected within such limits an addition to an old building, and had placed a chimney and fire place entirely *without* such addition, but looking into it, and fitted solely for its accommodation, it was held that these acts constituted no violation of the statute. (*Daggett* v. *State*, 4 *Conn. R.*, 60.) In this case, HOSMER, Ch. J., in delivering the opinion of the court, said: " The rule has long been established, that penal

statutes must be construed strictly. (*Reniger* v. *Fogossa*, 1 *Plowd. R.*, 17; *Commonwealth* v. *Bowles*, 1 *Salk.*, 205; 1 *Bl. Com.*, 88.) More correctly it may be said, that such laws are to be expounded strictly against an offender, and liberally in his favor. This can only be accomplished by giving to them a literal construction, so far as they operate penally; or, at most, by deducing the intention of the legislature from the words of the act. (*Heydon's Case*, 3 *Co. R.*, 7; *The King* v. *Gage*, 3 *Mod. R.*, 64.) In extension of the letter of the law, *nothing may be assumed by implication*, nor may the mischief *intended* to be prevented or redressed, as against the offender, be regarded in its construction. It was the object of the principle to establish a certain rule, by conformity to which mankind should be safe, and the discretion of the judge limited. How much this must contribute to the security and enjoyment of the citizen, is too palpably obvious to require illustration. Upon the before mentioned principle, it has been adjudged that an act made to punish the person who stole a *cow* is not applicable to him who steals a *heifer* (*Richard Cooke's Case*, *Leach's C. L.*, 109); and a law prohibiting the transportation of provisions in any wagon or otherwise to an enemy, is not infringed by driving fat oxen on the leg. (*The United States* v. *Sheldon*, 2 *Wheat. R.*, 119.) That the mischiefs at which these laws were aimed existed in both the cases alluded to, is past a question; but the acts prosecuted, not being within the words of the legislature, were considered as not within the prohibitions of the laws. I will only add, that the moment the strict construction of penal laws is abandoned, the difference between their interpretation and that of remedial laws must terminate, as there is no middle ground between them." (*Id.*, 63 *and* 64.)

*And* cannot be construed to mean *or*, in a penal statute. The 14th section of the act of the 14th July, 1832, as it stands, does not declare any forfeiture to attach upon the mere want of correspondence between the goods and the entry as a substantive and independent ground of forfeiture. Possibly there may be an omission of some words, by which it was intended to declare a forfeiture in such case; but as it is a penal statute,

Lowenberg v. The People.

they cannot be supplied by intendment. (*The United States* v. *Ten cases of shawls*, 2 *Paine's C. C. R.*, 162.)

THOMPSON, J., in the above case, says : " By the 4th section of the act of 1830, it is provided that if, upon the examination, any package shall be found to contain any article not described in the invoice, *or* if such package or invoice be made up with intent to defraud the revenue, the same shall be forfeited. The disjunctive particle *or* being used, the forfeiture declared may attach to the want of correspondence as well as to the fraudulent intent; but in the act of 1832 the conjunctive particle *and* is used in the like connection, and which, in a penal statute, cannot be construed *or*." (*Id.*, 165, 166.)

In *The Case of the Schooner Enterprise* (1 *Paine's C. C. R.*, 32), LIVINGSTON, J., in delivering the opinion of the court, says : " For, although ignorance of the existence of a law be no excuse for its violation, yet, if this ignorance be the consequence of an ambiguous or obscure phraseology, some indulgence is due to it. It should be a principle of every criminal code, and certainly belongs to ours, that no person be adjudged guilty of an offense unless it be created and promulgated in terms which leave no reasonable doubt of their meaning. If it be the duty of a jury to acquit where such doubts exist concerning a fact, it is equally incumbent on a judge not to apply the law to a case where he labors under the same uncertainty as to the meaning of the legislature. If this be involved in considerable difficulty, from the use of language not perfectly intelligible, unusual circumspection becomes necessary, especially if the consequence be so penal as scarcely to admit of aggravation. When the sense of a penal statute is obvious, consequences are to be disregarded; but if doubtful, they are to have their weight in its interpretation. It will at once be conceded that no man should be stripped of a valuable property, perhaps of his all; be disfranchised, and consigned to public ignominy and reproach ; unless it be *very clear* that such high penalties have been annexed by law to the act which he has committed." (*Id., p.* 34.)

If. the statute is ambiguous, the court ought not to inflict the penalty. (1 *Paine's C. C. R.*, 32.)

An act, subjecting one to punishment, must be within both the letter and spirit of the law. (*Crosby* v. *Hawthorne*, 25 *Ala.*, 221.)

A penalty cannot be created by implication. (*Jones* v. *Estis*, 2 *Johns.*, 380.) In this case the court say: "A penalty cannot be raised by implication, but must be expressly created and imposed."

*Berry* v. *Ripley* (1 *Mass. R.*, 167), is an authority to the same point.

An averment that the ship was fitted out, &c., "with intent that the said vessel should be *employed*," was held fatally defective; the words of the statute being, "*to employ*." (*United States* v. *Gooding*, 12 *Wheat. R.*, 460.)

In *Elam* v. *Ransom* (21 *Geo. R.*, 149), the court, per BRUNING, J., says: "The common law leans toward that construction of all statutes which is in *favor* of personal liberty, not that which is *against* personal liberty."

In *Lair* v. *Killmer* (1 *Duch. R.*, 522), the court, per Chief Justice GREEN, says: "In defining the crime and the punishment, penal statutes are to be taken strictly and literally. A penal law cannot be extended by construction. The act constituting the offense must be both within the spirit and the letter of the statute."

In *Commonwealth* v. *Carroll* (8 *Mass. R.*, 490), breaking and entering in the night time a warehouse with intent to steal, &c., was held not to be within the provision that if any person "shall in the night time enter, without breaking, or in the day time break and enter," &c.; and yet no one can doubt that the legislature intended to provide against breaking and entering in the night time.

In *State* v. *King* (12 *Louis. R.*, 593), it was held, that in construing penal statutes, courts cannot take into view the motives of the lawgiver, further than they are expressed in the statute.

The case of *Hartung* v. *The People* (22 *N. Y. R.*, 95), con-

Lowenberg *v.* The People.

tains nothing in the slightest degree conflicting with the authorities above cited. Judge DENIO, in his very able and elaborate opinion, nowhere intimates that penal statutes are not to be construed strictly, and in accordance with the authorities here cited. He does intimate, however, that it was the intention of the legislature of 1860, to preserve the punishment of death. He does not, however, express the opinion that the legislature did preserve capital punishment. The subject of construing penal or criminal statutes strictly, was not before the court. The question was, whether the legislature possessed the power, no matter with what certainty and precision the act was worded, to impose a punishment for an offense different in kind from that which existed when the crime was committed. The court held that no such power existed, and that a law which had that effect, was *ex post facto* and unconstitutional.

In reference to the law of 1860, Judge DENIO observes, that it is "inferable from the 1st section, and also from the 4th and 5th sections, that capital punishment was intended to be retained." All the authorities show, that if such an intention be merely "inferable," and not contained in express words, it is of no avail; for, in the language of GREEN, Ch. J. (1 *Duch. R.,* 522, *above cited*), "In defining the crime and the punishment, penal statutes are to be taken strictly and literally. The penal law cannot be extended by construction."

Judge DENIO further observes: "It is true that in the declaration of the first section, that no crime, except treason and the first degree of murder, should be punished with death, there is an implication, in the nature of a negative pregnant, that those crimes shall be so punished." In reference to the 4th section, he says: It may be "implied" that such was the intention of the legislature, and that in the 5th section there is an "implication" to the same effect.

While, with reference to the intention of the legislature to preserve capital punishment, the learned judge only uses the words "inferable," "implied" and "implication," he quite as distinctly concedes that "there was not in either of these sec-

tions, or elsewhere in the act, any separate provision for the punishment of that crime (murder in the first degree), or which declared that any crime should be punished with death." This is quite sufficient to dispose of the case of the plaintiff in error in his favor, for all must concede that the "letter of the law" of 1860, does not prescribe the punishment of death. In the language of HOSMER, Ch. J., in *Dagget* v. *The State* (4 *Conn. R.*, 63), " In extension of the letter of the law, nothing may be assumed by implication; nor may the mischief intended to be prevented or redressed, as against the offender, be regarded in its construction."

Although the counsel for the plaintiff in error have no doubt that the legislature of 1860 intended to abolish capital punishment, founding their opinion upon the skillful manner in which every section of any statute which could, within the rules of construction of criminal statutes, have the effect to continue that punishment, was abolished, yet they do not deem it of any particular importance whether the legislature so intended or not, it being sufficient, that if they intended to. continue capital punishment, they did not carry that intention into effect, but, on the contrary, abolished capital punishment. Whether that was the result of deliberate design or inadvertence, can make no difference in the result of this case.

III. The sentence of the plaintiff in error, that he shall " suffer death," is vague, indefinite and uncertain, and for that reason not susceptible of enforcement.

The sentence does not even provide that the prisoner shall suffer death by violence. The sentence is as uncertain as the law under which it was pronounced. The officer appointed to execute the sentence has no power to select the mode of death; to give him this power would be to clothe him with judicial functions and attributes. The sentence, within every rule of law applicable to the case, is a nullity.

IV. The plaintiff in error was tried and convicted in the Court of General Sessions of the peace, in and for the city and county of New York, on the 11th day of December, 1861, and was sentenced on 4th of January, 1862. The Decem-

Lowenberg v. The People.

ber term of the court expired on the third Saturday of that month, and the next term of the court could not begin until the first Monday of January, 1862, which came on the sixth day of the month. There was no law in existence at that time which permitted the New York General Sessions of the peace to hold court and pass sentence between the third Saturday of December and the sixth day of January following, the latter being the first Monday of the month. That court being one of limited jurisdiction, and deriving its powers only from express statutes, of course could not sit, except at the times specified in the statutes. The following are the only statutes applicable to the subject:

"The said Court of General Sessions (that is, 'the Court of General Sessions of the Peace in and for the city and county of New York') (3 *R. S.*, 311, § 66, *5th ed.*) shall commence and be held on the first Monday in every month, and may continue and be held every day from the commencement thereof, until and including Saturday in the third week thereafter." (3 *R. S.*, 312, § 70, *5th ed.*)

"Whenever the trial of a cause shall have been commenced in the Court of General Sessions of the Peace, in and for the city and county of New York, and the same shall not be concluded before the expiration of the term of said court, it shall be lawful for the said court to continue in session until the conclusion of said trial, and to proceed to judgment if they shall so deem necessary, in cases where conviction shall be had." (*Laws of* 1846, *p.* 4.)

An act to empower Courts of Sessions, in the several counties of this State, to extend their terms, and authorizing certain adjournments of such courts, passed April 9, 1859, provides as follows (*Laws* 1859, *p.* 465, § 1): "It shall be lawful for the Court of Sessions of any county of this State, to continue its sittings at any term thereof, so long as it may be necessary, in the opinion of such court, for the dispatch of any business, or the determination of any cases that may be pending before such court."

"§ 2. The Court of Sessions of any county in this State,

shall hereafter have, and may, in their discretion, exercise all the powers in regard to adjournments thereof, from time to time, which are now by law conferred upon or exercised by the Court of Oyer and Terminer of such county, in relation to adjournments of said last named court."

None of the statutes above cited gives the New York General Sessions of the Peace the power to extend its terms beyond the third Saturday after the first Monday of the month.

The act of 1859 does not confer this power, for the reason that it refers to the "Court of Sessions of any county." This language does not embrace the New York General Sessions of the Peace, in and for the city and county of New York.

This court expressly held, at the last General Term, that the phrase, "the Courts of Sessions of the several counties," did not include "the General Sessions of the Peace in the city and county of New York." (*People* v. *Court of General Sessions of the city and county of New York, reported in N. Y. Transcript,* Oct. 16, 1862.)

Justice INGRAHAM, in delivering the opinion of the court, observes : " These various provisions, to which I have referred, show, I think conclusively, that the old courts of General Sessions, *except in the city of New York,* were not continued after the Constitution of 1847, but that new courts were organized in all the other counties of the State under a different name, while the General Sessions in New York was continued with all its then powers and jurisdiction, and has been so recognized by the legislature in all laws passed since the adoption of the Constitution relating to the said court." * * " If this view be correct, the only question would be, whether the term ' Courts of Sessions,' as used in the act of 1859, is to be construed as applying to all the courts in this State of that name, and also to the General Sessions of the Peace in the city of New York.'"

The learned judge then proceeds to show that the language, " Courts of Sessions of the several counties " has no reference to the " General Sessions of the Peace in this city and county."

The act of 1846, above cited, does not give the court the power to extend its term, except in a case the trial of which

Lowenberg *v.* The People.

"shall not be concluded before the expiration of the term of said court." In that event it merely gives the court power "to continue in session until the conclusion of said trial, and to proceed to judgment, &c." In the case of Lowenberg, the trial ended on the eleventh day of December, A. D. 1861, about two weeks before the third Saturday of term.

It is clear, therefore, that none of these statutes gives the court the power to sit and pass judgment between the third Saturday of one term and the first Monday of the next term.

In construing these statutes, the attention of the court is invited to the authorities cited under point II. The rule of strict construction must prevail.

The sentence is not only vague, indefinite, uncertain, and not only susceptible of enforcement, but was passed by a court not in existence at the time.

V. The judgment of the court below should have been arrested.

*Nelson J. Waterbury* (district attorney), for the People, contended that the sentence of the prisoner was not illegal, and was capable of enforcement.

PECKHAM, J. I incline to think enough may be gathered by putting together parts of its different sections to hold and adjudge that murder, " of the first degree," as therein defined, was a " crime punishable with death," as prescribed in the 4th and 5th sections of the laws of 1860, page 712.

The first section of that act declares that "no crime hereafter committed, except treason and murder of the first degree, shall be punished with death."

It is true this section does not affirmatively enact that these crimes shall be so punished, but it does declare that no others shall.

The 2d section defines murder " of the first degree."

The 4th and 5th sections prescribe the punishment of persons " convicted of any crime punishable with death," but do not declare or define crimes so punishable. The 6th section prescribes the punishment of " murder in the second degree."

Section 9th declares that "the provisions of this act for the punishment of murder in the first degree shall apply to the crime of treason."

This is a strong implication that the punishment prescribed in the 4th and 5th sections, for persons "convicted of any crime punishable with death," applies to the crime of murder of the first degree, as there are but two punishments prescribed in that act, and one is confined expressly to persons guilty of "murder in the second degree."

The other punishment is therefore necessarily applied to murder in the first degree.

The 8th section recognizes the same thing.

The 7th section is only confusing, but does not destroy the enactments of the others.

But, assuming that "murder of the first degree," of which the prisoner is convicted, is by this act punishable with death, is the act, in that respect, constitutional?

The 5th section of the 1st article of the Constitution of 1846, declares that "cruel and unusual punishments" shall not be inflicted.

Execution by hanging was the mode adopted and required by law prior to the act of 1860, but that act expressly repealed the statute as to hanging, and has substituted nothing in its place.

In *The People* v. *Hartung* (22 *N. Y. R.*, 107), Judge DENIO properly says that it is not clear whether, under this act, "the manner of the execution should be determined by the court, the governor, or the sheriff."

If it cannot be decided which one has the power to direct the manner of the execution, can either one exercise any such power? I think all would agree, having reference to the duties of the different officers, that the manner of the execution should be directed by the court. Prior to this statute, I think, the court has always so directed in this State. If it were the duty of the court, then the court committed an error in this case, in omitting to give such direction.

It may justly be added, that there is nothing in the act in

Lowenberg *v.* The People.

terms authorizing either the court or the governor to direct the manner of the execution.

If the execution, then, shall ever be effected, its manner, practically, will rest entirely in the discretion of the sheriff.

The prisoner may thus "suffer" death in any manner agreeable to the discretion or the caprice of the sheriff. He may shoot, burn or torture him, or even starve him to death.

It is no answer to say that the prohibition in the Constitution is equally obligatory upon the sheriff as upon other officials.

Where is the remedy in case of its violation in such a case? This constitutional prohibition was directed to the legislature. It was intended to guide and govern their legislation. It was never aimed at a mere executive officer, whose whole duty, under our government, is simply to carry into effect a certain and declared law.

Suppose the legislature should enact that a person guilty of a certain offense should suffer such punishment, except hanging, as the sheriff of the county where he should be sentenced to jail, should think proper to inflict.

Would that be a valid law? I think not, for one reason — because it would permit, not that it directed, cruel and unusual punishments. The Constitution intended that the legislature should declare punishments not cruel and unusual — not leave it to the discretion of a sheriff whether they should be inflicted — and that is the view of this statute.

But there is another difficulty in the record in this case which I think fatal to this conviction.

The Court of Sessions, sitting on the fourth day of January, 1862, sentenced the prisoner to be executed on the 20th day of February, 1863, and "to imprisonment at hard labor until such punishment of death shall be inflicted."

The court thus inflict a punishment of over thirteen and a half months at hard labor, besides the punishment of death, when the act only authorizes a sentence of a year at hard labor.

In the *People* v. *Hartung*, before cited, the court expressly

held that imprisonment at hard labor before execution, was an additional punishment, and in that case, as it was imposed by an act passed after the offense had been committed, the court held it to be an *ex post facto* law, unconstitutional and void. In the case at bar this additional imprisonment or punishment being wholly unauthorized by law, is therefore illegal and void.

It may be urged that the governor, being authorized to issue his warrant for the prisoner's execution, may do so under the act at any time after a year from such sentence, whether the time shall have arrived for the execution, according to the sentence, or not.

It is true he may and must wait until after the expiration of the year from the time sentence was pronounced, but has he any authority to issue his warrant for the execution before the time fixed by the sentence? No such authority is given him. He does not pass or pronounce the sentence. He simply commands it "to be carried into execution."

But assuming that this act is utterly void for any reason, so far as regards the death penalty, is the punishment of imprisonment thereby rendered ineffectual, or in any degree impaired? I incline to think not.

Suppose the act had declared that any person guilty of murder in the first degree should be confined in prison until the legislature should pass a valid law to hang him. Very probably the legislature might not have the power to pass a valid law to that effect. It might be regarded as an *ex post facto* law; but would such a provision nullify or impair the penalty of imprisonment? I think not. It would be simply another way — an oblique and crooked way, perhaps — of imposing a penalty of imprisonment for life.

It is by no means clear that the legislature, or the author of this statute, intended that the convict should be ever actually executed. All the provisions as to inflicting death seem intended rather for alarm than for real peril to the convict.

By the fifth section it is declared that no execution shall take place until the whole record of the proceedings shall be

certified by the clerk of the court to the governor, nor until the governor shall issue his warrant, &c. Yet there is no statute making it the duty of the clerk to transmit such certified copy. Nor is the governor required ever to issue his warrant. He is not, even affirmatively, in terms authorized to issue it.

Holding the statute effective, therefore, as to the imprisonment, and void as to the death penalty — that passing a formal sentence of death, in itself utterly void and that cannot be executed, accompanied with a sentence of imprisonment until the punishment of death shall be inflicted, is simply a mode of sentencing to imprisonment for life, this judgment may be sustained.

LEONARD, J. The act of 1860 distinctly recognizes, as an existing fact, that certain crimes are punishable with death.

Is murder such a crime? From the earliest ages until the enactment of the statute referred to, murder has been uniformly punished with death by the nation to which the colony of New York belonged in 1775, and at the time of our separation from the mother country. The statutes and common law of that country are, by the Constitution of this State, continued in force, except so far as they are repealed or abrogated.

The act in question has not repealed or abrogated the penalty of death in case of murder, nor has any other statute of this State. On the contrary, the act of 1860 excepts murder in the first degree, from the abrogation of the death penalty as a punishment for crimes.

The 4th section provides a distinct penalty for crimes punishable with death. The offender shall be sentenced to confinement at hard labor in the State prison until the punishment of death shall be inflicted.

It is made the duty of the court to pass this sentence upon the conviction of the offender.

The mode of inflicting death is not prescribed. No warrant can therefore be issued by the governor for the execution of the person convicted and sentenced.

The condemned offender will remain, necessarily, in the State prison, awaiting the warrant, the residue of his life.

This result was, perhaps, the intention of the author of the act, although not probably that of the legislature.

The intention of the author or of the legislature, is not, however, referred to as an argument for or against the judgment.

The sentence pronounced is within the letter of the statute, in my opinion. .

The crimes punishable with death, referred to in the 4th section of the act of 1860, are not limited to cases where the penalty of death is provided by statute.

The first section of the late act is inconsistent with, and must be held to have repealed the first section of title one, chapter one, part fourth of the Revised Statutes, without the amendment provided by section seven of the act. That amendment is, however, disconnected from everything else in the chapter, and stands without any legal effect.

No argument is to be drawn, therefore, from the words " as herein provided," contained in the amended section, limiting the description of the offender contained in 4th section of the act, so as to require a statutory direction to include the offender who is to be sentenced.

The objection that the sentence was passed after the expiration of the term of the court, or in vacation, is not well taken.

It does not appear that the term had closed. The Court of General Sessions of the peace is authorized to continue its term so as to complete any unfinished trial. The term may have been prolonged from that cause. The presumption of law is in favor of the regularity of the proceedings of courts of justice.

The judgment ought to be affirmed.

INGRAHAM, P. J. (dissenting). The prisoner was tried and convicted in the Court of General Sessions, of the crime of murder in the first degree, and was sentenced to imprisonment and death.

The murder was committed on the 14th of November, 1861. The trial took place on the 11th of December, 1861, and the

Lowenberg *v.* The People.

prisoner was sentenced on the 4th of January, 1862, in the fourth week after the commencement of the December term. The court had been extended for the trial of another case, and during the week for which it was so extended, the sentence took place.

The great question we are called upon to decide in this case, arises, upon the construction of the act passed in 1860, in "relation to capital punishment, and to provide for the more certain punishment of the crime of murder." (*Laws of* 1860, *ch.* 410.)

Prior to the passage of this act, the law for the punishment of murder was contained in the Revised Statutes (3*d vol.*, *p.* 935).

The 1st section of this statute was simple and easily understood, and provided "that every person who should thereafter be convicted of treason, of murder, or of arson in the first degree, should suffer death for the same." The same chapter provided for the mode of execution, and the time within which it should take place.

By the act of 1860, the 1st section of the chapter of the Revised Statutes above referred to was amended so as to read as follows:

"Every person who shall hereafter be convicted of, 1st, treason against the People of this State, or 2d, of murder, or 3d, of arson in the first degree, as those crimes are declared in this title, shall be punished as herein provided."

The effect of this amendment was to abolish the section of the Revised Statutes as it existed at the time of the passage of the act of 1860, and to substitute in its place the section as adopted in that act.

It was thus enacted by the 1st section of that chapter of the Revised Statutes, as amended, that the crime of murder should be punished as provided for in the title 1, chapter 1, of part 4, of Revised Statutes. There is no section in the whole title, which provides any punishment for murder.

There never was any such provision, except in the first section, which was virtually repealed and taken away by the

amendment of 1860, and we look in vain throughout the whole chapter for any punishment to be inflicted for.this offense.

But, as· if to destroy entirely the supposition that anything was to be left in the statute sanctioning the punishment of death for murder, under the provisions of that act, the law of 1860 also repealed the section fixing the time for executing such punishment, the provisions for submitting the case to the governor for revision before execution, the provisions for reprieves in certain cases for females, the mode of execution by hanging, the directing the execution in the prison yard, and the provision for another place of execution, in case the prison of the county was unfit therefor.

While, therefore, the amended first section required the crime of murder to be punished as therein provided, the only portion of the chapter that contained any punishment had been taken away, and every portion of the chapter that contained anything relating to the punishment of death was utterly repealed.

We look in vain, therefore, throughout this title of the Revised Statutes for any punishment prescribed for the crime of murder, and unless some other provision is made in another statute, no such punishment can be found in the laws of this State as they existed at the time of this offense.

In the act of 1860, there is no punishment expressly provided for murder in the first degree.

The 1st section enacts that no other crime than treason and murder, in the first degree, shall be punished with death. This is a provision for limiting the punishment of other offenses, not providing punishment for the excepted cases, and while the statute provides a punishment for murder in the second degree, for arson and other offenses, it leaves the punishment for the greater offenses not only undefined, but if they can be discovered at all from the act, to rest on inferences merely to be drawn from the negative provisions of the first section.

It cannot be denied that at the time of the commission of this offense there was no provision of the law directly pre-

Lowenberg v. The People.

scribing the punishment of death for treason or murder in the first degree, or directing any punishment whatever, and if the court directs the execution of the prisoner, or the sheriff carries out such direction, the court and sheriff must act, in taking the life of a human being, without any direct authority of law, and upon a mere inference to be drawn from a negative provision of a statute, and from the absence of any law providing any other punishments. When a public officer is called upon to take the life of another, he may well ask that his duty should be clearly laid down by the law ; that such acts should not rest on mere inference or implication, but that he should have his warrant for what he does in the clear provisions of the statute and the mandate of the court. To take away the life of a prisoner under a doubtful construction of the law, or on a mere inference or implied authority from the absence of legislative provisions, might lead to a judicial murder rather than to carrying into effect the law of the land.

It is very clear that the legislature did not intend that all the offenses enumerated in the first section of the title in the Revised Statutes above referred to, should be punished with death. In that section was included the offense of arson in the first degree, and not even by inference can any authority be found for a greater punishment for this offense than imprisonment at hard labor in the State prison.

So the General Term of this district held, in the case of *Shepherd*, and in that case the Court of Appeals have since held that under the act of 1860 he could not be sentenced to any punishment. Whether such was the intent of the author of the act of 1860, in regard to the crime of murder, is a question not free from difficulty. The omission to provide, by direct enactment, any punishment for the highest crimes known to the law — treason and murder — the cautious repeal of every provision of the Revised Statutes bearing upon the death penalty or relating thereto, especially the absolute repeal of the section providing the mode of execution by hanging, without substituting any other direction as to the mode by which death was to be inflicted, do not make the duty of the

court clear or free from doubt, so as to warrant us in saying that the legislature clearly intended to retain the punishment of death for this offense.

I purpose now to examine the cases decided in the Court of Appeals, in which the act of 1860 has been the subject of discussion. These are, *The People* v. *Hartung* (22 *N. Y. R.*, 95), and *The People* v. *Shay* (22 *N. Y. R.*, 317).

It must be remembered that these cases were for offenses committed before the passage of the act of 1860, and the question involved in these cases was not whether offenses committed after its passage could be punished under it, but whether the repeal of the statute and the additional punishment of one year's imprisonment, as provided for in the fourth section, did not prevent the execution of the judgment, and the court decided such to be its effects.

The reason given for the reversal of the judgment, was that there was not at the time any law which authorized or sustained it, or which would warrant its execution; and in the case of *Shay*, all the exceptions at the trial, and the motion in arrest, were decided against the prisoner, but that judgment was also reversed, for the reasons stated, in the case of *Hartung*.

We have been referred to the views of the learned justice who delivered the opinion in those cases, as authority for holding that the punishment of death was retained by the act of 1860.

The substance of these views is, that no law at the time contained any separate provision for the punishment of murder in the first degree, or which declared that any crime should be punished with death; that if there was any punishment, it could only be known by inference or implication; that in the first section, which declared that no crime but treason and murder in the first degree should be punished with death, there "is an implication in the nature of a negative pregnant, that those crimes should be so punished;" that in the fourth section of the statute it was also implied that there were some crimes to be punished capitally, and, upon considering the whole law, that the intention to preserve the punishment of

Lowenberg v. The People.

death, when the governor shall approve of the sentence, in addition to imprisonment for one year, was so manifest that the court would assume such to be the effect of the statute.

It could not be necessary in that case to decide whether there was any punishment provided in the act of 1860 for the offenses of treason and murder in the first degree, if committed after the passage of the act. Although the act of 1860 provided that persons under conviction or sentence should be punished as if convicted under that act, still Judge DENIO held that there was not at that time any law which authorized or sustained the judgment, or would warrant its execution.

We are left, then, to the simple question whether, when the statute contains no provision imposing the punishment of death for murder in the first degree, such punishment should be inflicted, merely because it might be inferred from the statute that the legislature supposed the punishment of death was retained, or that such punishment should be inflicted, because in another part of the statute provision was made as to the action of the governor before the sentence could be carried out.

I cannot assent to the proposition that the court should condemn to death simply because they can guess that the legislature intended to preserve this punishment. Nor do I assent to the conclusion that it is very clear that any such intention existed. The alteration of the section which contained this punishment of death, the omission to substitute any other punishment, the studied repeal of the provisions relating to such executions, and particularly the repeal of the section which declared the mode in which such death should be effected, seem to me rather to imply that it was not intended to have such punishments continued. It is a well settled principle in the construction of a penal statute, that it must be construed strictly (*Sprague* v. *Birdsall,* 2 *Cow. R.,* 419); and a penalty cannot be raised by implication, but must be expressly created and imposed. (*Jones* v. *Estes,* 2 *Johns. R.,* 379.)

If so much strictness is required merely to impose a penalty

Lowenberg *v.* The People.

for the violation of law, of how much more importance is it to require clear warrant for the penalty of death and full authority to take human life, not merely resting on inference and implication, but on the full and express provision of law therefor.

It has been suggested that the defect of our statutes might be remedied by invoking the doctrine that a repeal of a statute, without substituting any in its place, revived the rules of the common law. This may be so, and may relieve the difficulty which would exist as to the mode of execution; but a difficulty will at once arise from the fact that it is not a mere repeal of a statute, but an amendment, in which the offense is regulated, and which purports elsewhere to provide a punishment, by directing that it should be punished "as is herein provided." It can hardly be said that the statute on this subject is repealed, so far as to revive the common law offense of murder and the common law punishment, while that statute remains in force.

I am aware that, in *The People* v. *Hartung* (23 *How. Pr. R.,* 314), a contrary opinion was expressed by HOGEBOOM, J., as to the effect of the act of 1860 on this question; but as the offense in that case was committed before the passage of the act, it can hardly be considered as controlling in this case.

The judgment should be reversed.

Judgment affirmed.'

---

[1] NOTE. — This judgment was affirmed by the Court of Appeals, in October, 1863, but not on all the grounds stated in the above opinions. The leading opinion in the Court of Appeals holds that the court erred in naming the day for the execution of the prisoner, but that was not a sufficient reason for reversal; that the day should be left to be designated by the governor; that, though the statute, declaring that the punishment of death should be inflicted by hanging, is repealed, it does not abrogate the common law which prescribed the same mode of punishment. BALCOM, J., said: "The proper sentence would have been, that the prisoner suffer death for the crime of murder in the first degree, in killing Samuel Hoffman, at the city of New York, on the 14th day of November, 1861, whereof he has been duly convicted, by being hung by the neck until he be dead, by the sheriff of the county in which he shall be imprisoned, at such time and place, after the expiration of one year from the date of his sentence, as such sheriff shall be commanded by a warrant issued by the governor, under